# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | |
|---|---|
| ROBERT AGUILERA MORENO, | 1:03-CV-05805 LJO JMD (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| R.D. RUNNELS, Warden, | [Doc #1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action has been referred to this court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Stanislaus, Case No. 205252.

Following a jury trial, Petitioner was convicted of first degree murder. The jury found true allegations that Petitioner personally inflicted great bodily injury, personally used a firearm

and committed the offense to further the activities of a criminal street gang. Petitioner was sentenced to a term of fifty-two years to life in state prison.

Petitioner timely appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"), case number F036130, claiming that there was insufficient evidence to establish the allegation that the offense was committed for the benefit of a criminal street gang, and that trial counsel was ineffective in failing to object to the expert testimony of a detective. *See* Answer to Petition, Exh. A (Petitioner's opening brief); Exh. B (The People's responsive brief); Ex. C (Petitioner's reply).[1] On January 14, 2002, the Fifth DCA affirmed Petitioner's conviction and sentence. Exh. D.

Petitioner timely petitioned the California Supreme Court for review, case number S104342. Exh. E. Review was denied without comment on March 20, 2003. Exh. F.

On June 2, 2003, Petitioner filed the instant petition, renewing the claims raised in Petitioner's appeal to the Fifth DCA. On February 9, 2004, Respondent filed an Answer to the instant Petition. Petitioner did not file a traverse.

## FACTUAL BACKGROUND

The Court adopts the facts as recited by the Fifth DCA in its opinion dated January 14, 2002:

> On the evening of March 4, 1999, Hugo A., his friends Timoteo G. And Felicano "Muto," his brother Victor, his uncle Victor Gonzales (Gonzales), and Moreno, were in the front yard of Hugo's home when a car drove by. The people in the car yelled "scraps" and "north side." Scraps is a derogatory term for members of the Sureno gang; north side is a term indicating those in the car were Norteno gang members. Gang signs and threats were exchanged. As the car passed by, the occupants threw bottles and rocks at Hugo's house. Moreno grabbed a bat and walked toward the car. When the occupants climbed out, Moreno threw the bat and broke the windshield.
> The police were notified of the incident. When the police arrived, Hugo and the others told officers that they were Surenos and the occupants of the car were Nortenos. After the police left, Moreno went home and returned a few minutes later with a rifle. Moreno indicated there were some people near his house who looked like the occupants of the car. Moreno thought they might do something to his family and he wanted to "shoot their asses." Moreno left, and a short while later Hugo and the others headed to Nino's Market. As they walked toward the store, Hugo heard gunshots. When he rounded the corner, he saw Moreno with a rifle in his hand and the victim on the ground. Moreno instructed Hugo and his friends to break the windows on the victim's car and they did so.

---

[1] All subsequent Exhibit references are to the exhibits attached to Respondent's Answer, unless otherwise noted.

     Between 6:30 and 7:00 p.m., on March 4, 1999, Juan Pinon (Pinon) was shot and killed outside Golden West Grocery, also known as Nino's Market, in Turlock. Accompanying Pinon at the time of his death were his brother Fidel, brother-in-law Jesus, and Jesus's brother, Juan. Pinon was wearing a red belt and red bandanna; there was a red bandanna wrapped around the steering wheel of the car. Red is a color identified with the Nortenos, although Fidel denied he and the others were looking for trouble with the Surenos. Pinon's hair was styled in a fashion typical for members of the Nortenos in Turlock.

     Pinon and his companions had driven from Delhi to Turlock, where they stopped at the market to buy sodas. Blanca and her cousin, Liliana, watched Pinon and his three friends get out of the car. They previously had seen the four in the neighborhood, and knew from past experience to expect a fight when these four showed up at Nino's Market.

     After entering the store, Pinon realized he had left his wallet in the car. The companions returned to the car, but a group of 10 or 12 people followed them. Among the group that followed was Moreno, who was carrying a rifle. The other members of the group were carrying "bats and sticks or whatever." Moreno pointed the rifle directly at Pinon, Fidel began running back to the store, and Moreno fired two shots.

     At that point, Hugo and his companions came around the front of the store. One of them pointed a rifle at Fidel and his companions. Fidel then heard more shots come from where Moreno was located. Fidel and his two companions ran into the store to hide.

     Victor saw Moreno shoot Pinon and then chase Fidel and the others into the store. Moreno was attempting to operate the bolt on the rifle while chasing Fidel. Muto went to the front of the store, but Moreno called him back. Moreno told all his friends not to talk to the police.

     Nino, the owner of the market, heard popping sounds and then the door to his store opened. Nino saw a neighborhood kid known as "Muto" standing outside the door with his hand behind his back. Nino then realized three men were hiding inside the store. When one of the men said his brother had been shot, Nino called 911.

     On June 7, 1999, Moreno was charged with Pinon's murder (count 1), participation in a criminal street gang (count 2), and felony vandalism (count 3). With respect to count 1, it was alleged that Moreno personally inflicted great bodily injury, personally used a firearm, and committed the offense to further the activities of a criminal street gang. Gonzales also was charged in count 3, however, he was deported prior to trial.

     On three occasions, including March 11, 1999, when booked into the Stanislaus County jail, Moreno told jail officials that he was Sureno and that Nortenos were his enemies. When Moreno's girlfriend visited him in jail, their conversation was recorded. During the conversation, Moreno admitted being at the scene of the shooting and firing his gun once or twice. Moreno also referred to the "fucking Nortenos" during these conversations and opined that the prosecution would never be able to prove that he, Moreno, was a gang member.

     Victor, Hugo, and Timoteo testified pursuant to plea agreements. According to Victor, Nortenos had been coming by for about three weeks and making threats. Moreno had told both Victor and Hugo that he, Moreno, was a Sureno. Moreno showed them his tattoos, including the number "13," which symbolizes Surenos. Victor had seen Moreno put gang graffiti on various places, including the side of Nino's Market.

     Hugo confirmed at trial that he, Moreno, Muto, Gonzales, and Timoteo were Surenos. Timoteo also admitted being a Sureno and acknowledged the Nortenos were their enemy. Victor claimed he used to be a Sureno, but was no longer associated with the gang. Victor received a telephone death threat warning

him not to testify from a member of a local faction of the Surenos known as Brick City.

Timoteo claimed that Pinon had been his enemy for at least two years prior to the shooting. According to Timoteo, Pinon and some other "enemies" showed up at his house the day before the shooting looking for a fight. They were driving the same car Pinon was driving the day of the shooting.

Jose P., a Norteno and a friend of Pinon, acknowledged that the area around Nino's Market was Sureno territory and that there had been hostilities between the Surenos and Nortenos for about three weeks prior to the shooting.

Stanislaus County Sheriff's Detective William Heyne testified that the Hispanic gangs were divided between the north, Norteno, and the south, Sureno. The Norteno's claimed the color red and the number 14. Sureno's claimed the color blue and the number 13. There was a great deal of graffiti from these gangs in the area around Nino's Market. Some of the graffiti contained explicit challenges.

City of Corona Police Officer Thomas Weeks testified as an expert on Southern California criminal street gangs. Officer Weeks stated that Corona Varrio Locos (CVL) was a criminal street gang: one of its factions was "Acesinos," which is Spanish for assassin. When Moreno lived in Corona, Moreno was an admitted member of CVL and of the faction known as Acesinos. Moreno's writings, tattoos, and gang graffiti corroborated his gang membership. At least two members of the Acesinos had prior convictions for crimes listed in section 186.22, subdivision (e). In 1994 Moreno was served with a notice that he was considered to be a member of the Acesinos street gang, a criminal street gang within the meaning of section 186.22.

Officer Weeks explained that as members of various gangs in Corona travel outside Corona, they claim CVL membership instead of one of its factions. As CVL members travel north and cross into Tulare or Fresno County, they claim Sureno membership, because they are from Southern California. Officer Weeks opined that Surenos were a criminal street gang.

City of Turlock Detective Kevin Davis testified as an expert on criminal street gangs. He explained that Hispanic gang members who move to the Turlock area from greater Los Angeles usually claim Sureno gang membership. According to Detective Davis, any hostilities that may have been present among the various Sureno factions in Southern California are set aside when they come to Stanislaus County because they need to band together to achieve "strength in numbers" in Northern California. Detective Davis opined that the Surenos are a criminal street gang whose members have committed numerous crimes in Stanislaus County, including murder, attempted murder, robbery, and burglary. Timoteo, who law enforcement classified as a Sureno, was convicted of assault with a deadly weapon on February 25, 1998. Detective Davis opined that by wearing a red belt and red bandanna, Pinon was advertising his Norteno affiliation. The shooting of Pinon was committed for the benefit of the Sureno gang as a demonstration of Sureno strength in the area.

Prior to coming to Stanislaus County, Victor, Hugo, Timoteo, and Gonzales all claimed membership in a Los Angeles based gang that was Sureno affiliated. Detective Davis noted that in February 1998, Moreno and Muto were involved in an assault with a deadly weapon.

Detective Davis opined that Moreno was an active gang member at the time of the shooting. This opinion was based on Moreno's use of a gang moniker, his gang-related tattoos, admissions to jail personnel, regular association with other known gang members and associates such as Timoteo, Muto, and Gonzales, along with the fact that the targets of Moreno's actions were rival gang members.

Moreno admitted he had been a member of CVL and specifically a faction called Acesinos in Corona, where he previously resided prior to moving to

4

Turlock two years before the shooting. Moreno acknowledged knowing that CVL was involved in committing crimes. Moreno testified he first met Victor, Hugo, and Timoteo when he moved to Turlock after being released from jail. Although he claimed the color blue, and associated with these three, Moreno denied being part of their gang. Moreno acknowledged having a rifle the day of the shooting, but claimed to have traded the rifle to Victor for a speaker and amplifiers prior to the shooting.

At the close of trial, the count 3 offense, felony vandalism, was not presented to the jury. On March 15, 2000, the jury returned its verdict of guilty of first-degree murder, not guilty of the section 186.22, subdivision (a) offense, and true findings on all enhancements appended to the murder charge.

On May 26, 2000, Moreno's motion for a new trial was denied. He was sentenced to a total term of 52 years to life based upon a term of 25 years to life on the first degree murder conviction, a consecutive term of 25 years to life for the personal infliction of great bodily injury, and a consecutive 2-year term for the section186.22, subdivision (b) enhancement. The four-year term for personal use of a firearm was stayed pursuant to section 6534.

## DISCUSSION

I. **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d). Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II. **Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C . § 2254(a).

The instant petition is reviewed under the provisions of the AEDPA. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, a petition for habeas corpus will not be granted unless the adjudication in question "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); *see* Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining "clearly established Federal law," the Court looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; *see also* Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

This Court may not issue the writ simply because in its independent judgment the state court decision applied clearly established federal law erroneously or incorrectly; for a writ to

issue, 'that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, ninth circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See* Duhaime v. DuCharme, 200 F.3d 597, 600-01 (9th cir. 1999).

AEDPA requires that this court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Moreover, we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

III.  **Review of Petitioner's Claims**

    **A.**    **Claim One: Insufficient Evidence to Support the section 186.22(b) Gang Benefit Enhancement**

        **1.**    **Factual Background**

Petitioner's conviction was enhanced pursuant to California Penal Code Section 186.22. Section 186.22, subdivision (b)(1) provides, in relevant part:

> "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony of which he or she has been convicted, be punished by an additional term of one, two, or three years at the court's discretion."

The term "criminal street gang" is defined as:

> "Any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the ...enumerated [offenses]..., having a common name or common identifying symbol, and whose members individually or collectively engage or have engaged in a pattern of criminal gang activity." Id., § 186.22, subd. (f).

In his first ground for relief, Petitioner claims there was insufficient evidence to establish that the killing was for the benefit of a criminal street gang, because his friends in Turlock do not constitute a criminal street gang. In the alternative, Petitioner contends that if the evidence does establish the existence of a criminal street gang, the evidence is nonetheless insufficient to establish that a primary activity of the gang was the commission of one or more of the enumerated offenses listed in section 186.22(e).

### 2. Clearly Settled Supreme Court Law

In reviewing sufficiency of evidence claims, California courts expressly follow the standard articulated in Jackson v. Virginia, 443 U.S. 307 (1979). See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

Sufficiency claims are judged by the elements as defined by state law. Jackson, 443 U.S. at 324 n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as to those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597 (1981).

### 3. Review of Claim by State Courts

This claim was first presented on direct appeal to the Fifth DCA. The Fifth DCA denied the claim on May 28, 2003, in a reasoned opinion. See Exh. D. The claim was then presented to the California Supreme Court in a petition for review; however, the petition was summarily denied on August 13, 2003. See Exh. F. The California Supreme Court, by its "silent order"

1  denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for
2  the same reasons stated in the opinion of the Fifth DCA.  Y1st v. Nunnemaker, 501 U.S. 797,
3  803 (1991).
4      In rejecting Petitioner's claim, the Fifth DCA found the evidence fully supported the
5  jury's finding that the crime was committed for the purpose of promoting the criminal conduct of
6  a street gang.  The Fifth DCA found the evidence sufficient to establish: (1) an ongoing
7  association of three or more persons with a common name and shared identifying symbols; (2) a
8  patter of criminal gang activity; (3) the enumerated offense was a primary activity of the gang;
9  and (4) that the killing was "for the benefit of, at the direction of, or in association with" the
10 gang.  See Exh. D at 9.

**4.    Analysis of Petitioner's Claim**

12     The appellate court's conclusion was not unreasonable as there was substantial evidence
13 of each of the elements necessary to sustain an enhancement under California Penal Code section
14 186.22(b).  With respect to the ongoing association element, sufficient evidence was presented
15 upon which a reasonable jury could make such a finding.  Witness Hugo A. testified that he, his
16 brother Victor, Muto, Gonzales, Timoteo and Petitioner were all Surenos. Exh. D at 9.  Evidence
17 was presented that prior to moving to Stanislaus County Petitioner, Hugo, Victor Gonzalez and
18 Timoteo all claimed membership in factions of the Surenos gang.  Id.  Officer Weeks and
19 Detective Davis testified that gang members moving from the Los Angeles are northward cease
20 identifying with a specific faction of the Surenos, but instead claim Surenos membership and
21 band together in Northern California to achieve strength in numbers.  Id.  And there was
22 testimony that Petitioner and the other Surenos in the area claimed the color blue and number 13.
23 Id.  This Court agrees with the conclusion of the Fifth DCA that a reasonable jury could find
24 based on this evidence that there existed an ongoing association of three or more persons
25 (Petitioner, Timoteo, Hugo, Muto, Victor and Gonzales) with a common name (Surenos) and
26 shared identifying symbols (the color blue and the number 13).
27     The evidence of a pattern of criminal gang activity (Cal. Pen. Code § 186.22(f)) is
28 likewise sufficient.  The Fifth DCA noted that such a pattern can be established by the current

1  offense and one prior offense. Exh. D at 9. Detective Davis testified that in February of 1998,
2  both Petitioner and Muto were involved in an assault with a deadly weapon, a listed offense
3  under Cal. Pen. Code § 186.22(e). This testimony in conjunction with the evidence presented
4  regarding the current offense sufficiently established a pattern of activity.

5  This Court likewise agrees with the Fifth DCA that the evidence was sufficient to sustain
6  a finding on the "primary activity" element of the enhancement. Detective Davis testified that
7  members or associates of the Sureno gang were involved in numerous other incidents of
8  specified criminal acts in the county. There was further testimony identifying specific incidents
9  involving Petitioner, Muto, Gonzales and Timoteo. This evidence was sufficient to establish the
10 primary activity element of the offense.

11 Lastly, the record supports the jury's finding that the killing was "for the benefit of, at the
12 direction of, or in association with" a criminal street gang. Exh D. at 10. Detective Davis opined
13 that the shooting was "a demonstration of strength and dominance in the area" of the Surenos
14 gang. Davis further testified that the shooting was intended to enhance the reputation of the
15 Surenos and to forestall encroachment by the Nortenos. Evidence was presented that in three jail
16 bookings Petitioner claimed Sureno membership and identified Nortenos as his enemies. The
17 victim was identified as a Norteno by his red belt and bandanna, his haircut, and his past
18 altercations with Timoteo, a Sureno. Testimony established that Petitioner, Timoteo, Victor,
19 Hugo, Muto, and Gonzales all lived in the area near Nino's Market, generally considered Surenos
20 territory. The victim and his companions were from outside the neighborhood, and according to
21 the testimony of two independent witnesses, fighting ensued whenever the victim and other
22 Nortenos came into the neighborhood. As the Fifth DCA notes, the evidence established that
23 there was "virtually no explanation or motive for the shooting *except* gang hostilities between the
24 Sureno and Norteno." Exh. D at 11.

25 The Fifth DCA reasonably applied the Jackson standard in reviewing the sufficiency of
26 the evidence supporting Petitioner's sentence enhancement under California Penal Code section
27 186.22(b). Accordingly, Petitioner's claim should be denied.

28 **B.     Claim Two: Ineffective Assistance of Counsel**

### 1. Factual Background

In his second ground for relief, Petitioner claims that his trial counsel rendered ineffective assistance by failing to object at trial to the testimony of Officer Weeks. Petitioner asserts that Officer Weeks' testimony was both irrelevant and unduly prejudicial, and trial counsel's failure to object thereto resulted in the effective denial of assistance of counsel in violation of Petitioner's Sixth and Fourteenth Amendment Rights.

### 2. Clearly Settled Supreme Court Law

The law governing ineffective assistance of counsel claims is clearly established for purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result...would have been different." 466 U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive petitioner of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 688, 697 (1984). Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. See Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S. at 659, n. 25 (1984). Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000); Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

### 3.  Review of Claim by State Courts

Petitioner's claim was rejected by the Fifth DCA in a reasoned opinion on March 22, 2004. The Fifth DCA first rejected Petitioner's claim that the testimony of Officer Weeks was not relevant to the issues at trial. Exh. D at 12. Because Moreno was charged both with a felony offense and a gang enhancement under section 186.22, subdivisions (a) and (b), "his history of gang involvement and activity, as well as the activities of fellow gang members, was highly relevant and necessary to prove the requisite elements of the offense and the enhancement." Id. The Fifth DCA further noted that when used to establish motive, intent, or identity, as it was in Petitioner's trial, a history of gang activity is both relevant and admissible. Id. at 12-13.

The Fifth DCA also rejected Petitioner's claim that the testimony was improper character evidence under Cal. Evid. Code § 1101. The court noted that the evidence was not presented to show criminal disposition, but rather to prove motive and intent as well as to establish the elements of the gang enhancement and offense. As such, it was not inadmissible character evidence.

Finally, the Fifth DCA rejected Petitioner's claim that the evidence was more prejudicial than it was probative under Cal. Evid. Code § 352. The court noted the trial court's broad discretion in ruling on the admissibility of evidence, and that section 352 exists to exclude evidence "that has little or no effect on the issues but tends to evoke an emotional bias." Id. at 13. The Fifth DCA found that it was not enough that the evidence was damaging to Petitioner's

defense – Officer Weeks' testimony was relevant to the issues, and therefore within the bounds of the trial court's discretion to admit. Id. It noted that Petitioner's acquittal on the section 186.22(a) gang offense was further evidence that the evidence did not have an unduly inflammatory impact on the jury.

Given its determination of these issues, the Fifth DCA found that no objection to Officer Weeks' testimony at trial would have been sustained. Therefore it concluded that Petitioner's ineffective assistance of counsel claim could not be sustained. Id.

**4.     Analysis of Petitioner's Claim**

Petitioner fails to demonstrate either that trial counsel rendered ineffective assistance, or that Petitioner was in any way prejudiced by the failure of counsel to object at trial to the testimony of Officer Weeks. First, trial counsel's lack of objection to the testimony of Officer Weeks was not "outside the range of reasonable professional assistance." Strickland, 466 U.S. 668, 687 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). Petitioner's ineffective assistance of counsel argument rests on the premise that the testimony of Officer Weeks was irrelevant to the issues at trial. But as the Fifth DCA notes, Officer Weeks' testimony was highly relevant to the section 186.22 offense and gang enhancement. Officer Weeks' testimony was not offered merely to show a criminal disposition, but went to establish issues of motive, intent, or identity. And, while harmful to Petitioner's case, this Court agrees with the findings of the Fifth DCA that the testimony as to Petitioner's past and present gang affiliations and activities was not so prejudicial as to tip the balance in favor of exclusion, particularly given its high degree of relevance. Regardless of any objection, the evidence would have been admitted. As such, his failure to object cannot be considered ineffective or prejudicial. United States v. Aguon, 851 F.2d 1158, 1172 (9th Cir. 1988) (en banc).

Moreover, even if trial counsel's failure to object was error, Petitioner has not demonstrated the requisite prejudice necessary to support an ineffective assistance of counsel claim. Petitioner claims that the jury found the gang enhancement to be true "because of the volume of gang evidence provided by Detective Weeks." Pet. at 13, 29. However, the testimony of Officer Weeks aside, there was substantial evidence establishing the necessary elements for

1   the section 186.22(b) gang enhancement.  *See Supra*, pp. 9-10.  Thus the inclusion of Officer
2   Weeks' testimony cannot have been prejudicial to Petitioner's defense.
3         Petitioner fails to demonstrate either that trial counsel erred in not objecting to the
4   testimony of Officer Weeks, or that any prejudice resulted from the inclusion of the testimony in
5   question.  Accordingly, Petitioner's claim should be denied.

**RECOMMENDATION**

7         The Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be
8   DENIED and the Clerk of the Court be DIRECTED to enter judgment.
9         These Findings and Recommendations are submitted to the Honorable Lawrence J.
10  O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636
11  (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court,
12  Eastern District of California.
13        Within thirty (30) days after being served with a copy, any party may file written
14  objections with the court and serve a copy on all parties.  Such a document should be captioned
15  "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections
16  shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after
17  service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to
18  28 U.S.C. § 636 (b)(1)©.  The parties are advised that failure to file objections within the
19  specified time may waive the right to appeal the District Court's order.  Martinez v. Y1st, 951
20  F.2d 1153 (9th Cir. 1991).
21
22  IT IS SO ORDERED.
23  **Dated:   September 28, 2007**            **/s/ John M. Dixon**
                                                    UNITED STATES MAGISTRATE JUDGE
24
25
26
27
28

cd                                             14